KAREN P. HEWITT
United States Attorney
REBECCA S. KANTER
Assistant U.S. Attorney
California State Bar No. 230257
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Phone: (619) 557-6747
Fax: (619) 235-2757
E-mail: rebecca.kanter@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ARA AVETYANTS, et. al., <br><br> Defendant. | Criminal Case No. 08cr1455-BEN <br><br> **RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS:** <br><br> **(1) TO SUPPRESS EVIDENCE;** <br> **(2) TO SUPPRESS STATEMENTS; AND** <br> **(3) TO FILE FURTHER MOTIONS** <br><br> Date:  September 2, 2008 <br> Time:  2:00 p.m. <br> Courtroom: 3 <br> The Honorable Roger T. Benitez |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, United States Attorney, Karen P. Hewitt, and Assistant U.S. Attorney Rebecca S. Kanter, and hereby files its Response and Opposition to Defendant's Motions to Suppress Evidence, Suppress Statements and File Further Motions. This Response and Opposition is based upon the files and records of this case, together with the attached Statement of Facts, Memorandum of Points and Authorities, as well as the Government's Motion for Reciprocal Discovery.

//

//

//

//

//

**I**

**STATEMENT OF FACTS**

**A.    INITIAL STOP**

On April 26, 2008, at approximately 10:15 a.m., Border Patrol Agent Kevin Zoetewey conducted a vehicle stop on a white BMW 5 series with no license plates ("the vehicle") on Monument Road, approximately one-quarter mile east of Hollister Street. Due to the close proximity to the United States/Mexico International Border, this area is notorious for the presence of undocumented aliens attempting to further their illegal entry into United States. Just prior to stopping the vehicle, Agent Zoetewey observed the occupants of the vehicle throwing trash, receipts and banking documents from the vehicle.

After the vehicle yielded, Agent Zoetewey approached the occupants and identified himself as a Border Patrol Agent and conducted an immigration inspection. The driver, later identified as Ara Avetyants, was determined to be an Armenian national with a valid Permanent Resident Alien card. The two passengers – later identified as Ashot Barsegian and Arsen Grishai Motivosyan – were also in possession of valid immigration documents and admitted to being Armenian nationals. When asked what they were doing in the area, the Defendants said they were "looking to ride some horses." During the inspection, Border Patrol Agent Richard Stallings arrived. After Agent Zoetewey confirmed that all three possessed valid immigration documents, Defendants were permitted to drive away.

**B.    SECOND STOP**

Approximately two hours later, Agent Stallings observed the same three individuals from the earlier stop walking in Border Field State park. Thirty minutes later, Agent Stallings saw the white BMW 5 series parked at the entrance to the park. All four doors of the vehicle were open and four individuals were getting ready to enter the vehicle. Recalling that there were only three individuals in the vehicle during the earlier stop, Agent Stallings was suspicious when he saw four individuals entering the vehicle. Agent Stallings observed that the individual about to enter the driver's seat was Avetyants; the other three individuals were about to enter as passengers.

As Agent Stallings approached the vehicle, the four individuals sat down on a log next to the BMW. After greeting the individuals and identifying himself as a U.S. Border Patrol Agent, he

conducted an immigration inspection of all four individuals. The three individuals who were previously stopped were found in possession of valid immigration documents; the fourth individual was not. The fourth individual, identified as Ara Hakobyan, presented a California drivers license. Agent Stallings asked Hakobyan if he had any documents to prove his citizenship, and Hakobyan said "no." Agent Stallings asked all four individuals if they remembered him from the earlier stop. The Defendants all nodded their heads in agreement; Hakobyan did not. Agent Stallings asked where Hakobyan came from, and the Defendants said Hakobyan was just someone they met in the park. Hakobyan said he was from Glendale in the United States on asylum from Armenia. The Defendants then began to tell Agent Stallings about how they had just met Hakobyan in the park and were being friendly to one of their fellow countrymen by giving him a ride.

Agent Stallings asked Hakobyan how he got to the park. All four individuals appeared nervous and began to stutter. Hakobyan said he arrived by cab from Glendale, but could not recollect how much he paid for the cab ride. He said he was in the area "on vacation." Avetyants said he was giving Hakobyan a ride to "wherever he wants."

Agent Sean Sather arrived for back-up and conducted a records check on Hakobyan via dispatch. Records checks revealed that Hakobyan was denied asylum and ordered removed in January, 2008. Meanwhile, Agent Stallings asked Avetyants, the driver with the keys, for permission to search the vehicle. Avetyants gave Agent Stallings consent to search the vehicle. Agent Stallings found laminated, uncut, 2x3 inch photos of Hakobyan in the glove box. Hakobyan admitted to having a brown duffle bag with his personal belongings in the trunk. At 12:15 p.m., all four individuals were arrested and transported to the Imperial Beach Border Patrol Station for further processing.

**C.     Material Witness Statement**

At the station, Hakobyan admitted to crossing the border at Border Field State Park by climbing over the international border fence. He said that the Defendants were going to take him to Los Angeles.

//
//
//
//

**II**

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Defendant Avetyants contents that both the initial stop of the vehicle by Border Patrol Agent Zoetewey as well as the later stop by Agent Stallings were unreasonable and violated his Fourth Amendment rights. Because both stops were brief, investigatory stops near the border supported by reasonable suspicion, they were both valid. The Court should therefore deny Defendant's Motion to Suppress Evidence.

**A.    Investigatory Stops and Roving Border Patrol Stops Based On Reasonable Suspicion Are Lawful**

Under <u>Terry v. Ohio</u>, an investigatory stop is lawful if based on reasonable suspicion. 392 U.S. 1, 20-21 (1968). Reasonable suspicion is simply "a particularized and objective basis for suspecting the person stopped of criminal activity." <u>United States v. Ornelas</u>, 517 U.S. 690, 696 (1996). In forming reasonable suspicion, the officer is entitled to draw upon personal experience and specialized training and to make inferences from, and deductions about, the cumulative information available to him that "might well elude the untrained person." <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002). "The process does not deal with hard certainties, but with probabilities" and "commonsense conclusions about human behavior." <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981). The standard amounts to more than a "hunch" and less than probable cause. <u>Arvizu</u>, 534 U.S. at 274. It is based on the totality of the circumstances. <u>Id.</u> at 275-77. When police reasonably suspect that a person is engaged in criminal activity, police may stop that person and question him for a limited period of time. <u>Terry</u>, 392 U.S. at 22-24.

In the border context specifically, a roving border patrol may stop a vehicle in the general area of the border and question its occupants if "specific, articulable facts" give rise to reasonable suspicion that the vehicle may contain illegal aliens. <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884-85 (1975). The factors courts consider to determine whether there was reasonable suspicion to stop the vehicle include: (1) the distance from the border; (2) information about illegal border crossings in the area; (3) the normal pattern of traffic in the area; (4) the driver's suspicious behavior; (5) the appearance of the vehicle; (6) the number of passengers; (7) the characteristics of the area in which the vehicle is

1 encountered; and (8) the appearance of the occupants. Id. If there is reasonable suspicion to stop the vehicle, the officer may inquire about citizenship, immigration status, and suspicions circumstances. Id. at 881-82; United States v. Cervantes-Flores, 421 F.3d 825, 830 (9th Cir. 2005) (finding that questions regarding citizenship did not exceed scope of stop based on reasonable suspicion.)

**A.     The Initial Stop By Agent Zoetewey Was Lawful**

In this case, as indicated in the probable cause statement, Border Patrol Agent Kevin Zoetewey stopped Defendant's BMW 5 series on Monument Road in Imperial Beach, California. This area is in very close proximity to the United States/Mexico international border, and is notorious for illegal alien smuggling activities. Just prior to stopping the vehicle, Agent Zoetewey observed the occupants of the vehicle throwing trash, receipts and banking documents from the vehicle.

These facts, when analyzed under the standard articulated in Brignoni-Ponce, clearly indicate that Agent Zoeteway had reasonable suspicion to stop the vehicle. The location where the vehicle was stopped was in very close proximity to the border. There were multiple occupants. The agent knew from experience that the area was commonly used to further the illegal entry of individuals from Mexico into the United States. The vehicle, a 2008 BMW 5 series, was a highly unusual vehicle for this area close to the border. The vehicle had no license plate. Moreover, the behavior of the occupants in throwing items out of the window, particularly documents such as receipts and banking documents, was very suspicious. Considering the totality of circumstances, there is ample support for Agent Zoetewey, based on his training and experience, to reasonably suspect "that criminal activity 'may be afoot.'" Arvizu, 534 U.S. at 273; see, e.g., United States v. Carrizales-Toledo, 454 F.3d 210, 214-25 (5th Cir. 2007) (finding reasonable suspicion where border patrol stopped a vehicle that was traveling in a remote area known for smuggling and driver behaved suspiciously); Cortez, 449 U.S. at 418 (stating that in making a reasonable suspicion determination, the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement").

Moreover, the scope of the stop was properly limited. If there is reasonable suspicion to stop the vehicle, the officer may inquire about citizenship, immigration status, and suspicions circumstances. Brigioni-Ponce, 422 U.S. at 881-82. Here, Agent Zoetewey queried all three occupants of the vehicle about their nationality and checked their immigration documents. He also asked them about the specific

circumstances of their presence near the border. Defendant said they were looking to ride horses. They were allowed to drive away as soon as Agent Zoetewey determined that all three possessed valid immigration documents. Because the stop was supported by reasonable suspicion and the scope was properly limited, the stop was lawful.

**B.      The Second Stop By Agent Stallings Was Lawful**

Approximately two hours after the initial stop, Agent Stallings observed the same three individuals walking in Border Field State Park. Thirty minutes later, he saw the BMW parked at the entrance to the park. All four doors of the vehicle were open and four individuals were getting ready to enter. Having arrived at Agent Zoetewey's vehicle stop earlier, Agent Stallings recalled that the BMW previously had only three occupants. As he approached the vehicle, the individuals sat down on a log next to the BMW.

After greeting the individuals and identifying himself as a Border Patrol Agent, he conducted an immigration inspection. He concluded that three individuals were in possession of valid documents while one was not.

Agent Stallings clearly had reasonable suspicion to detain the vehicle for this second immigration stop. The vehicle was at the entrance to the Border Field State Park, which is immediately adjacent to the international border between the United States and Mexico. As described in § II.A, *supra*, the vehicle was a 2008 BMW 5 series with no plates, an unusual vehicle to find in the Border Field State Park. Moreover, Agent Stallings had the benefit of having arrived at the first vehicle stop, and he noted that there were only three occupants in the car two and a half hours earlier in the day. The fact that there were now four people about to enter the car was a new, intervening fact that justified the re-inspection of the vehicle and its occupants.

Moreover, the scope of the stop was clearly reasonable. Agent Stallings did not personally inspect the immigration documents of the occupants during the first stop; the immigration inspection at the first stop was conducted by Agent Zoeteway. Therefore, in order to confirm that each occupant was properly holding his own immigration document, Agent Stallings naturally had to review each one and see the photograph of the individual on the card in order to compare it to the individual offering the card. The subsequent questions regarding where the fourth person came from, how he got there,

questions to him about his citizenship status, and where he was going were all relevant to the immigration purpose of the stop: to establish whether the individuals were citizens of another country with no permission to be in the United States. United States v. Cervantes-Flores, 421 F.3d 825, 830 (9th Cir. 2005) (finding that questions regarding citizenship did not exceed scope of stop based on reasonable suspicion.)

Because the stop was lawful, there is no basis to suppress the evidence under the exclusionary rule.

### C. **Defendant Avetyants Voluntarily Consented To The Search Of The Vehicle**

Where agents obtain voluntary consent, they may search without a warrant and even without probable cause. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Here, Defendant Avetyants voluntarily consented to the search of his vehicle. Consent need not be knowing or intelligent, but must be voluntary, that is, it must not be the product of coercive police behavior that overbears the will of the individual. See United States v. Watson, 423 U.S. 411, 424 (1976).

The Ninth Circuit has developed a "totality of circumstances" standard to determine whether consent is voluntary. Specifically, there are five *non-exclusive* factors relevant to this inquiry: (1) whether the defendant is in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given;[1] (4) whether the defendant was told he had the right not to consent; and (5) whether the defendant was told that a search warrant could be obtained. United States v. Cormier, 220 F.3d 1103, 1112 (9th Cir. 2000). "The fact that some of these factors are not established does not automatically mean that consent was not voluntary." United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988).

Defendant Avetyants was not in custody when he gave consent to search the vehicle. Custody involves the deprivation of "freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 437, 444 (1966). The Defendant bears the burden of proving that he was in custody. United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984). Defendants were sitting outside their car on a log in a park

---

[1] After the Cormier decision, the Ninth Circuit cast doubt on the relevance of Miranda warnings, concluding that it is at best an "open to question . . . whether the inclusion or exclusion of Miranda warnings in a givens set of circumstances should weigh much in either direction in considering voluntariness." United States v. Perez-Lopez, 348 F.3d 839, 847 (9th Cir. 2003).

when they were detained. They were not taken into a building or a vehicle, nor were they restrained in any way. As evidenced by the probable cause statement in this case, Defendant Avetyants was merely subjected to a brief investigatory stop at the point in time he was asked for his consent. See Terry v. Ohio, 392 U.S. 1, 20 (1968). The stop was akin to a routine traffic stop, which is not a "custodial" situation despite the obvious limitations it puts on the driver's and passengers' freedom of action. See U.S. v. Berkemer, 468 U.S. 420, 441 (1984) (acknowledging that a traffic stop necessarily curtails a driver's freedom of action, but the coerciveness of the stop is limited by its brief and public nature.) The stop in this case was merely a border stop made in the presence of multiple suspects. See United States v. Galindo-Gallegos, 244 F.3d 728, 730-32 (9th Cir. 2001) (no custody during border stop because questioning occurred in public with 2 officers and 15-20 suspects), amended by 255 F.3d 1154 (9th Cir. 2001).

Second, Agent Stallings did not have his gun drawn. Notably, Defendant does not indicate (in his moving papers, let alone in a declaration) that a weapon was ever drawn. Nor is there any suggestion that Agent Stallings threatened Defendant in any way. Further, although Agent Stallings did not Mirandize Defendant Avetyants before he requested consent to search the vehicle, it was not necessary because he was not under arrest. See § III.D, *infra*. Therefore it has no bearing on the voluntariness determination. Under a totality of circumstances, the consent was voluntary. Unlike in Florida v. Royer, 460 U.S. 491 (1983), cited by Defendant Avetyants, Defendant Avetyants was not taken into a small room and outnumbered prior to being asked for his consent, as happened in Royer. Defendant has failed to demonstrate "a more serous intrusion on his personal liberty." Id. at 502. Accordingly, the Court should deny Defendant's motion to suppress evidence..

## III

### DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

Defendant Avetyants moves to suppress his statements. The only statements made by Defendant were the statements made to Border Patrol Agents Zoeteway and Stallings during the two stops in the field. Because Defendants were not in custody during either encounter, their statements were not the result of a custodial interrogation and did not need to be preceded by Miranda warnings.

//

1  **A.      Standards Governing Admissibility of Statements**

2  A statement made in response to custodial interrogation is admissible under Miranda v. Arizona, 384 U.S. 437 (1966) and 18 U.S.C. § 3501, if a preponderance of the evidence indicates that the statement was made after an advisement of rights, and was not elicited by improper coercion. *See* Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence standard governs voluntariness and Miranda determinations; valid waiver of Miranda rights should be found in the "absence of police overreaching.")  Although the totality of circumstances, including characteristics of the defendant and details of the interview, should be considered, improper coercive activity must occur for suppression of any statement.  *See* id. (noting that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"); *cf.* Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) ("Some of the factors taken into account have included the youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.") (citations omitted).

**B.      Standards Governing Grant or Denial of Evidentiary Hearing**

Under Ninth Circuit and Southern District precedent, as well as Southern District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to suppress only when the defendant adduces specific facts sufficient to require the granting of the defendant's motion. *See* United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) (where "defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer, . . . . the district court was not required to hold an evidentiary hearing"); United States v. Moran-Garcia, 783 F. Supp. 1266, 1274 (S.D. Cal. 1991) (boilerplate motion containing indefinite and unsworn allegations was insufficient to require evidentiary hearing on defendant's motion to suppress statements); Crim. L.R. 47.1.  The local rule further provides that "the Court need not grant an evidentiary hearing where either party fails to properly support its motion for opposition."

Defendant has failed to dispute by way of declaration or any sworn statement any of the facts in the probable cause statement.  Therefore, the Court should decline to conduct an evidentiary hearing since no issues of fact have been properly raised.

### C. Adequate Proof to Support Rejection of a Motion to Suppress

The Ninth Circuit has expressly stated that a proffer by the United States based on the statement of facts attached to the complaint is alone adequate to defeat a motion to suppress where the defense fails to adduce specific and material facts. *See* Batiste, 868 F.2d at 1092. Even if Defendant provides factual allegations, the Court may still deny an evidentiary hearing if the grounds for suppression consist solely of conclusory allegations of illegality. See United States v. Wilson, 7 F.3d 828, 834-35 (9th Cir. 1993) (District Court Judge Gordon Thompson did not abuse his discretion in denying a request for an evidentiary hearing where the appellant's declaration and points and authorities submitted in support of motion to suppress indicated no contested issues of fact).

### D. Defendants' Statements Should Not Be Suppressed

#### 1. Defendants Were Not In Custody When They Were Questioned By Agent Zoetewey

Custody involves the deprivation of "freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 437, 444 (1966). The Defendant bears the burden of proving that he was in custody. United States v. Charles, 738 F.2d 686, 692 (5th Cir. 1984).

In this case, Defendant Avetyants has failed to articulate any argument, facts or theory suggesting that Defendants were in custody when stopped by Agent Zoetewey. Defendants were merely subjected to a brief investigatory stop. See Terry v. Ohio, 392 U.S. 1, 20 (1968). The stop was akin to a routine traffic stop, which is not a "custodial" situation despite the obvious limitations it puts on the driver's and passengers' freedom of action. See U.S. v. Berkemer, 468 U.S. 420, 441 (1984) (acknowledging that a traffic stop necessarily curtails a driver's freedom of action, but the coerciveness of the stop is limited by its brief and public nature.)

The stop in this case was merely a border stop made in the presence of multiple suspects. See United States v. Galindo-Gallegos, 244 F.3d 728, 730-32 (9th Cir. 2001) (no custody during border stop because questioning occurred in public with 2 officers and 15-20 suspects), amended by 255 F.3d 1154 (9th Cir. 2001). Defendants were obviously free to leave once their immigration status was confirmed, as evidenced by the fact that they **did** leave – they were permitted to drive away after the brief investigatory stop. Obviously, they were free to leave and therefore not in custody. Because they were not in custody, Miranda warnings were not required prior to asking them the routine immigration related

questions during the brief detention. The motion to suppress the statements made to Agent Zoetewey should be denied.

**2.      Defendants Were Not In Custody When They Were Questioned By Agent Stallings**

Defendant Avetyants conclusorily asserts that "it is evident that the defendants were not free to leave." (Def. Mtn. at 14-15.) Defendant Avetyants has pointed to no facts that support this conclusion. To the contrary, the facts surrounding the stop by Agent Stallings demonstrate that Defendants were not in custody.

As with the first stop, the second stop was merely a brief, investigatory stop. *See* § II.D.1, *supra*. Custody involves the deprivation of "freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 437, 444 (1966). Defendants' freedom of action was not deprived in any significant way. Unlike during the first stop, where Defendants were seated in the vehicle, Defendants were sitting outside the car on a log near their car when Agent Stallings approached them. They were not handcuffed or their movement otherwise physically impeded. Although they were clearly not free to leave while Agent Stallings conducted his immigration check, "a brief detention at the border by immigration and customs officials of persons presenting themselves for admission to the United States is not [in] custody [for Miranda purposes], even though such persons are not free to leave. . ." United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001).

The only difference between the two stops was that more questions were asked of the individuals during the second stop based on the additional, unique suspicious circumstances presented by the second encounter. These additional questions did not convert the second stop into a custodial situation and were still within the scope of the stop. See United States v. Cervantes-Flores, 421 F.3d 825, 830 (9th Cir. 2005) (finding that questions regarding citizenship did not exceed scope of stop based on reasonable suspicion.) Because Defendants were not in custody when they were detained by Agent Stallings, Agent Stallings was not required to read them their Miranda rights prior to asking them questions about their immigration status and the suspicious circumstances. Therefore, Defendant Avetyants's motion to suppress the statements made to Agent Stallings should be denied.

**3.      Defendant's Statements Were Voluntary**

Defendant does not provide any basis for which his post-arrest statements should be suppressed.

Defendant failed to submit a declaration as required by the local rules, and thus fails to adduce specific and material facts to warrant an evidentiary hearing.

In evaluating the voluntariness of statements, courts consider "whether, considering the totality of the circumstances, the Government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988); see also United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993) (crucial question is whether the defendant's will was overborne when he confessed). A confession is voluntary if it is the "product of a rational intellect and a free will." Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir.1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)). The relevant circumstances include both the characteristics of the accused and the details of the interrogation. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). At a minimum, coercive police activity is "a necessary predicate" to finding a confession involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986).    In the present case, there is no evidence to suggest that Defendants' statements to either Agents Zoetewey or Stallings were the result of any coercion or improper inducement. Defendant Avetyants has provided no articulable facts in support of his claim that the statements made at the time of his arrest were involuntary. Without specific supporting facts showing material facts in dispute, Defendant Avetyants's motion should be denied without a hearing and the statements admitted as voluntary.

## IV

## DEFENDANT'S MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

The Government does not object to the granting of leave to file further motions as long as the further motions are based on newly discovered evidence or discovery provided by the Government subsequent to the instant motion at issue.

## V

## GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY

**A.    All Evidence That Defendants Intends To Introduce In Their Case-In-Chief**

Since the Government will honor Defendants' requests for disclosure under Rule 16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1). Pursuant to Rule 16(b)(1), the

Government requests that Defendant permit the Government to inspect, copy and photograph any and all books, papers, documents, photographs, tangible objects, or make copies or portions thereof, which are within the possession, custody, or control of Defendants and which Defendants intends to introduce as evidence in their case-in-chief at trial.

The Government further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession and control of Defendants, which they intend to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom Defendants intends to call as a witness. The Government also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the Government receives the reciprocal discovery to which it is entitled.

**B.    Reciprocal Jencks – Statements By Defense Witnesses (Other Than Defendants)**

Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires production of the prior statements of all witnesses, except a statement made by Defendants. The time frame established by Rule 26.2 requires the statements to be provided to the Government after the witness has testified. However, to expedite trial proceedings, the Government hereby requests that Defendant be ordered to provide all prior statements of defense witnesses by a reasonable date before trial to be set by the Court. Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

**V**

**CONCLUSION**

For the foregoing reasons, the Government requests that the Court deny Defendants' motions, except where unopposed, and grant the Government's motion for reciprocal discovery.

DATED: August 19, 2008.

Respectfully submitted,
KAREN P. HEWITT
United States Attorney

/s/*Rebecca Kanter*
REBECCA S. KANTER
Assistant United States Attorney
Attorneys for Plaintiff

1 | United States of America
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4                          UNITED STATES DISTRICT COURT
5                         SOUTHERN DISTRICT OF CALIFORNIA
6   UNITED STATES OF AMERICA,        )  Criminal Case No. 08cr1455-BEN
                                     )
7                   Plaintiff,       )
                                     )  CERTIFICATE OF SERVICE
8           v.                       )
                                     )
9   ARA AVETYANTS, et. al,           )
                                     )
10                  Defendant.       )
                                     )
11  _____ )

12  IT IS HEREBY CERTIFIED THAT:

13      I, REBECCA S. KANTER, am a citizen of the United States and am at least eighteen years of
14  age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

15      I am not a party to the above-entitled action. I have caused service of **RESPONSE AND
    OPPOSITION** on the following parties by electronically filing the foregoing with the Clerk of the
16  District Court using its ECF System, which electronically notifies them.

17      1)   GaroGhazarian
        2)   Kris Kraus
18      3)   Jodi Thorp

19      I hereby certify that I have caused to be mailed the foregoing, by the United States Postal
    Service, to the following non-ECF participants on this case:
20
        None
21
    the last known address, at which place there is delivery service of mail from the United States
22  Postal Service.

23      I declare under penalty of perjury that the foregoing is true and correct.

24      Executed on August 19, 2008.

25                                              /s/ *Rebecca Kanter*
                                                REBECCA S. KANTER
26
27
28

                                        15          Criminal Case No. 08cr1455-BEN